UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| JOHNNY NICHOLS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Case No. 3:16-CV-266 JD |
|  | ) |  |
| NANCY A. BERRYHILL, Acting | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## **OPINION AND ORDER**

This is Plaintiff Johnny Nichols' second time before this Court appealing the denial of benefits. With respect to the first appeal, the magistrate judge remanded the case indicating that the ALJ failed to adequately discuss whether Nichols' back impairments met a Listing, and noted that on remand the ALJ should expound upon the credibility analysis consistent with SSR 96-7p. *Nichols v. Colvin*, No. 313-CV-01205-CAN, 2015 WL 196379 (N.D. Ind. Jan. 13, 2015). In response, the Appeals Council remanded the case for further administrative proceedings consistent with the Court's order. R. at 422-24.

Supplemental hearings were then held before newly assigned Administrative Law Judge Mario Silva ("ALJ"). On February 19, 2016, the ALJ relied on the testimony of vocational expert Carrie Anderson ("VE") in finding that Nichols was capable of performing other work in the economy and was therefore not disabled. On May 3, 2016, Nichols filed a complaint in this Court seeking review of the final decision of the Defendant Commissioner of Social Security denying his application for social security disability benefits [DE 1]. Because the VE's testimony with respect to stooping was inconsistent with the social security regulations, remand is required to resolve this inconsistency. Further necessitating remand, is the ALJ's errors with respect to

determining Nichols' residual functional capacity. For these reasons, as detailed below, the Court remands this matter to the Commissioner for further proceedings.

**I. FACTS**

Nichols alleges that he has been disabled since January 1, 2015, due to chronic low back pain caused by degenerative disc disease with radiculopathy.[1] Nichols worked for twenty-five years as a core setter, lifting iron weighing over two hundred and fifty pounds. He had to quit his job in January 2011, because of his back pain. Thereafter, Nichols attempted to work as a packer and kitchen supervisor because he needed the income. But despite taking extra pain medication to get through the workday, the pain was intolerable and he could not sustain the work.

Medical records from 2008 through September 2015 document his repeated visits and treatment for back pain by various doctors, including his treating physician, Dr. Vidya Kora. In 2008, an MRI revealed that Nichols had a degenerative disc protrusion at L5-S1 extending posteriorly into the left lateral recess causing nerve root impingement and degenerative changes in the L4-L5 intervertebral disc space. R. at 180. The following month, Nichols was diagnosed with a lumbar herniated disc with foot drop. R. at 187. He received a lumbar epidural injection of steroids and was referred for physical therapy. R. at 178, 187, 201.

Nichols continued to complain of back pain despite receiving physical therapy. R. at 200. In January 2010, Dr. Kora diagnosed Nichols with degenerative joint disease of the lumbosacral spine and left sided sciatica. R. at 200.

In June 2011, Nichols underwent a consultative examination by Dr. M. Korman, MD. Dr. Korman noted that Nichols complained of frequent headaches and had a limited range of motion in his cervical, lumbar, and thoracic spine. R. 208-13. Dr. Korman reported that Nichols' forward

---

[1] Nichols was 48 years old at the time of his disability onset date and 49 years old at the time the ALJ denied his claim for disability insurance benefits.

flexion of the lumbar spine was 40 degrees (with normal being 90), while his extension was 15 (with normal being 25), and his lateral flexion was 15 on both right and left sides (with normal being 25). Dr. Korman documented that Nichols had tenderness in the spinal and paraspinal regions.

In August 2011, Nichols presented with complaints of exacerbated low back pain and it was noted that he had lumbosacral palpable tenderness and paraspinal spasm. R. at 247. He was diagnosed with exacerbation of low back pain, lumbosacral radiculitis, and degenerative disc disease. From October 2011 through April 2012, Nichols continued to treat with Dr. Kora for back, hip, leg, and joint point, joint swelling, and headaches. R. at 253-56. On April 16, 2012, Dr. Kora prescribed Nichols a cane. R. at 253.

On May 17, 2012, Dr. Kora completed a medical source statement and opined that Nichols could never regularly lift more than ten pounds. R. at 257-61. Dr. Kora believed that Nichols could stand and/or walk for less than two hours and could sit for less than six hours in a workday due to his severe back pain marked by muscle spasms and positive bilateral straight leg raising tests. Dr. Kora concluded that Nichols could never kneel, crouch, crawl or stoop. She opined that his condition was permanent and referred Nichols to an orthopedic surgeon. R. at 262.

From June 2012 through April 2015, Nichols continued to treat with Dr. Kora for hypertension, osteoarthritis, back pain, and depression. R. 603-58. Treatment notes from January 2013 through November 2013, described Nichols as complaining of back pain and needing refills on his medication. R. at 627-48. His musculoskeletal and neurological examinations were normal, but he was diagnosed with back pain and osteoarthritis. Nichols' medical records from September 2014 through April 2015, demonstrate that Nichols consistently suffered from back spasms and was on narcotic pain medication. R. at 603-18. Lumbar spine imaging from September 2014 revealed mild degenerative changes to the lower lumbar spine. R. at 661.

3

During an orthopedic evaluation on November 6, 2014, Nichols complained of back pain which radiated into his left leg and was marked by numbness, tingling, and weakness. R. at 587-91. He rated the pain at an eight (on a scale of one to ten) and indicated that the pain was worse with weather, bending, sitting, getting up from a seated position, and standing. Nichols weighed 235 pounds and had a body mass index ("BMI") of 32.79 kg/m2.[2] Dr. T. Ryan, DO, observed abnormal gait and bilateral paralumbar tenderness. Dr. Ryan diagnosed Nichols with low back pain, likely secondary to degenerative disc disease L4/L5 and L5/S1 and scheduled a lumbar MRI.

Dr. Kora completed another medical source statement on August 10, 2015. R. at 598-602. Dr. Kora diagnosed Nichols with back pain, degenerative joint disease, and sciatica. Positive objective signs were lumbar muscle spasm and positive supine straight leg raising test. Dr. Kora opined that Nichols could sit for fifteen minutes at a time for a total of less than two hours and stand/walk for ten minutes at a time for a total of less than two hours in a workday. Dr. Kora noted that Nichols required a cane to stand or walk. She also indicated that Nichols would need a job that permitted shifting position at-will from sitting, standing, and walking, and that he would need a fifteen minute unscheduled break every hour. She did not believe that Nichols could lift and carry even ten pounds in a competitive work situation. Dr. Kora also assessed that Nichols must never twist, stoop, bend, crouch, squat, or climb ladders. She indicated that Nichols would

---

[2] The social security rulings recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. SSR 02-1p. While documents reflect Nichols' fluctuating weight, it does not appear that he was diagnosed with obesity or that he claimed during the administrative process to being limited by the same.

4

be off task for twenty percent of the workday due to his symptoms and he was incapable of even "low stress" work.

Nichols underwent another consultative examination on September 22, 2015. R. at 662-73. Consultative examiner J. Smejkal, MD, noted that Nichols complained of severe back pain which radiated down his left leg and required him to walk with a prescribed cane. Nichols described experiencing difficulties in daily activities due to limited mobility. On examination, Dr. Smejkal noted that there was spinous and paraspinal tenderness in the lumbar region, and that Nichols was only able to stoop and squat with difficulty. Dr. Smejkal opined that Nichols could occasionally lift/carry up to fifty pounds, frequently lift/carry up to twenty pounds, sit for six hours, stand for one hour, and walk for one hour during a workday. Dr. Smejkal concluded that Nichols required the use of a cane to ambulate and could never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl. He believed that Nichols' limitations had lasted for longer than twelve consecutive months.

On September 3, 2015, testimony was received from the claimant and neurologist Dr. Karl Manders (an impartial medical expert) ("ME"). R at 333-82. After the hearing, ALJ Silva sent Nichols for the consultative examination with Dr. J. Smejkal. Thereafter, ALJ Silva conducted another hearing on January 11, 2016, during which the claimant and VE testified. R. at 298-332.

Nichols testified that he tried working several jobs since 2011 by taking extra pain medication and unscheduled breaks, but he was unable to withstand the pain. Because he was covered by a high deductible insurance plan through his wife, Nichols indicated that he could not afford to get the MRI that Dr. Ryan had scheduled. Nor could Nichols afford to continue treatment with the specialist. Nichols indicated that he was advised that having surgery would

5

likely provide no benefit because of his existing arthritis. Nichols testified that he can sit for five to twenty minutes and stand for fifteen to twenty minutes before his pain is unbearable. He testified that he cannot bend or stoop because he cannot get back up on account of his back pain. He is also unable to drive.

The ME testified that based on his review of the medical records, Nichols' back problems did not meet the requirements of any Listing; however, Nichols did have documented back pain and reduced range of motion in the lumbar spine. Dr. Manders opined that Nichols could perform work that included lifting/carrying ten pounds frequently and twenty pounds occasionally. He believed that Nichols was capable of sitting for eight hours, so long as he had a sit-stand option in order to stretch and relieve the pain every hour. He indicated that Nichols would need "ergonomic changes" in his sitting position and work environment which would be "very significant in allowing him to do the work, and that may be necessary for him to be employed successfully in some occupations." Dr. Manders clarified that whether or not certain ergonomic accommodations were needed would "depend[] on the job." Dr. Manders further opined that Nichols could stand for fifteen to twenty minutes per hour for a total of two hours. However, Nichols would have to avoid repetitive bending, twisting, or climbing of stairs, and he could not crouch, crawl, or climb ladders, ropes, or scaffolds due to the arthritis in his back. Dr. Manders did not believe that a cane was required from an anatomic standpoint, but he opined that it would make standing more comfortable for Nichols.

The VE testified that based strictly on the (relevant) hypothetical posed to her (which offered an assigned residual functional capacity ("RFC")[3] of sedentary work, with the ability to

---

[3] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545.

lift/carry fifty pounds occasionally and twenty pounds frequently, sit for six hours, stand for one hour, and walk for one hour with a cane for ambulation, with the added limitations of no climbing of ladders, ropes, and scaffolds, no crouching or crawling, occasional balancing, kneeling, stooping, and climbing of ramps/stairs, occasional pushing/pulling bilaterally, avoiding occasional exposure to hazards and frequent exposure to humidity, wetness, and pulmonary irritants, but with the added ability to frequently operate a motor vehicle, operate foot controls, and use the upper extremities), Nichols would not be able to perform his past work. However, the VE opined that Nichols could still perform other work in the economy, such as work as a surveillance monitor, order clerk, and final assembler. The VE confirmed that, generally speaking, a person cannot maintain competitive work if he would be off-task more than ten percent of the workday. Per the VE, the Dictionary of Occupational Titles ("DOT") indicates that stooping only occurs from a standing position, but not from a seated position. Thus, the VE testified that there is no "stooping required in sedentary jobs."

The ALJ issued a decision on February 19, 2016, denying Nichols disability benefits and concluding that Nichols was not disabled under the Social Security Act because he was able to perform other work in the national economy (step 5). Nichols did not file exceptions to the ALJ's decision, thereby making the ALJ's decision the final determination of the Commissioner. 20 C.F.R. § 404.984(d). Nichols seeks review of the Commissioner's decision, thereby invoking this Court's jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. STANDARD OF REVIEW

This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to the ALJ's findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III.  DISCUSSION

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant

has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

>	1. Whether the claimant is currently engaged in substantial gainful activity;

>	2. Whether the claimant has a medically severe impairment;

>	3. Whether the claimant's impairment meets or equals one listed in the regulations;

>	4. Whether the claimant can still perform relevant past work; and

>	5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, then in between steps three and four, the ALJ must assess the claimant's residual functional capacity, which, in turn, is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In relevant part, Nichols appeals the ALJ's failure to resolve the inconsistency in the VE's testimony and the regulations concerning whether sedentary work requires stooping. Nichols also contends that the ALJ's RFC determination and the ALJ's discrediting of Nichols' complaints are not supported by substantial evidence. Because this case hinges on whether Nichols can perform other work, the Court first explains why the VE's testimony was unreliable.

The Court then details additional errors with respect to the RFC determination which shall be corrected on remand.

## IV. ANALYSIS

### A. VE Testimony

At step five of the analysis for evaluating disability claims, the ALJ must determine whether the claimant's residual functional capacity enables him to perform jobs in the national economy. *Zurawski*, 245 F.3d at 886. If a claimant has no non-exertional limitations, that is, if he can perform the full range of work in his exertional level, the ALJ can rely on the Grid[4] to determine whether sufficient jobs exist. 20 C.F.R. § 404.1569; 20 C.F.R. § 404.1569a(b). If, however, the claimant has non-exertional limitations, which reduce the number of jobs that he can perform in his exertional level, the ALJ must pose a hypothetical to a vocational expert incorporating all of the claimant's limitations, and the vocational expert will then testify whether appropriate jobs exist. *Zurawski*, 245 F.3d at 889; *see also* SSR 96–9p.

In this case, the ALJ concluded that Nichols could perform sedentary work with various non-exertional limitations. Importantly, the impact of an RFC for less than a full range of sedentary work is especially critical for individuals like Nichols, who have not yet attained age 50. SSR 96-9p. This is so because age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work; and thus, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions. *Id*.

---

[4] The medical vocational guidelines, commonly known as the Grids, are tables which evaluate a claimant's ability to work by matching his age, education, and work experience with his work capability. 20 C.F.R. pt. 404, Subpt. P, Appendix 2.

10

With respect to the functional limitation concerning the ability to stoop, SSR 96–9p discusses the stooping requirements inherent in sedentary work: An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. Moreover, the regulation indicates that a complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply; but, restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. SSR 96–9p. Basically, a person must be able to stoop occasionally in order to perform all sedentary work. *Id*. Moreover, SSR 83-14 defines stooping as "bending the body downward and forward by bending the spine at the waist." That regulation also indicates that in order to perform substantially all of the exertional requirements of most sedentary jobs, a person would need to stoop occasionally (from very little up to one-third of the time, depending on the particular job). SSR 83-14.

In this case, the VE testified that her opinion was consistent with the DOT which defined stooping as only occurring from a standing position and not from a seated position. Thus, it was the VE's belief that *no sedentary jobs required the ability to stoop*. However, this testimony directly contradicts the regulations indicating that the ability to occasionally stoop is required in most unskilled sedentary occupations. SSR 96-9p; SSR 83-14. Therefore, given the VE's incorrect assumption that sedentary work can't involve stooping, the Court has no way of knowing whether the VE properly considered the fact that working as a surveillance monitor, order clerk, and/or final assembler might actually require stooping. *See, e.g., Lange v. Astrue*, No. 11 C 2958, 2012 WL 5818258, at *7–8 (N.D. Ill. Nov. 14, 2012) (wherein the VE testified that sedentary work could be performed by the claimant as a bench assembler, order clerk, and

surveillance system monitor, but if the claimant could never stoop, then those jobs would be unavailable).

The Commissioner suggests that this shortcoming is not akin to the type of problem identified in SSR 00-4p and cases like *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) and *Craft v. Astrue*, 539 F.3d 668, 681 (7th Cir. 2008), requiring the ALJ to resolve apparent conflicts between the DOT and the testimony of the VE. While this may be true, the problem here is actually worse. That is, the VE's testimony was just wrong with respect to the non-exertional requirements of sedentary work as denoted by the regulations.[5] In other words, the VE erroneously believed that stopping was *never* required of *any* sedentary jobs. But that simply isn't true, per SSR 96-9p and SSR 83-14. And ALJ's may not rely on evidence provided by a VE if that evidence is based on underlying assumptions or definitions that are inconsistent with the social security regulatory policies or definitions. SSR 00-4p. Because the VE misunderstood the stooping requirements of sedentary work (despite identification of the error by Nichols' attorney during the administrative hearing), the occupational information provided by the VE cannot provide substantial evidence to support the ALJ's conclusion. *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016) (reliance on the testimony of the VE is only permissible if the testimony is reliable) (citing *Overman*, 546 F.3d at 464; *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)). Because the Commissioner bears the burden in showing that there are a significant number of jobs in the national economy that Nichols is capable of performing. *Young*, 362 F.3d at 1000, remand is required to resolve this inconsistency.

---

[5] Although SSRs are interpretive rules and do not have the force of law, the SSA makes them binding on all components of the agency. 20 C.F.R. § 402.35(b)(1).

**B. RFC Finding**

The ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," SSR 96–8p, based upon medical evidence as well as "other evidence, such as testimony by the claimant." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even as to limitations that are not severe. *Id.*; *see* 20 C.F.R. § 404.1529(a) (in making a disability determination, the ALJ must consider all of a claimant's symptoms, including pain, and how those symptoms affect a claimant's daily life and ability to work). The ALJ must then build "an accurate and logical bridge from the evidence to the conclusion" so that a court can assess the validity of the agency's decision and afford the claimant meaningful review. *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). Here, the ALJ's RFC analysis is insufficiently substantiated.

With specific regard to the ALJ's finding that Nichols had the functional capacity to occasionally stoop, this determination lacks the requisite logical bridge. The ALJ assigned Dr. Smejkal's opinion substantial weight, who had opined that Nichols could never stoop. The ALJ then went on to suggest that he was giving deference to Nichols' complaints of pain, but confusingly found that Nichols was able to occasionally stoop. Thus, it appears that the ALJ believed that he was imposing a more restrictive stooping limitation than that which was opined by Dr. Smejkal, but he didn't.

Moreover, to the extent that the ALJ intended to impose a less restrictive stooping limitation (meaning, allowing for something more than "no stooping"), the basis upon which he did so was not supported by the record. The ALJ found that Nichols could occasionally stoop because his "recent physical examinations indicate that [his] spine is without spasm or

13

tenderness." R. at 286. But the ALJ mischaracterized the medical evidence in this respect. In fact, Nichols' medical records from September 2014 through April 2015 demonstrate that he consistently suffered from back spasms. Further, in November 2014 and September 2015, it was noted that upon examination Nichols presented with bilateral paralumbar tenderness. Thus, whether by mistake or design, the ALJ mischaracterized the most recent medical evidence (spanning a year's worth of time) in concluding that Nichols could occasionally stoop, and then the ALJ improperly substituted his own opinion. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

The ALJ's conclusion that Nichols could occasionally stoop is further undermined by the fact that longtime treating physician, Dr. Kora, opined as recently as August 2015 that Nichols could never stoop or bend[6]—a sentiment echoed by Nichols during his testimony. While the ALJ discounted this line of evidence on account of the fact that Nichols was not recommended to undergo back surgery, R. at 286, 288, this is not a case where potential treatment methods are available, such that a claimant's decision not to pursue that treatment is an indication that his limitations are not as severe as he claims. To the contrary, the record shows that Nichols pursued other forms of treatment that were suggested to him, including physical therapy, narcotic pain medication, and steroid injections. These treatments did not control his pain and he was still

---

[6] The Court recognizes that the treating physician rule has been abrogated as to claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c; *see also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 FR 62560 at 62573-62574 (Sept. 9, 2016) ("we would no longer give a specific weight to medical opinions . . . this includes giving controlling weight to medical opinions from treating sources . . . [and] [w]e would not defer or give any specific evidentiary weight, including controlling weight, to any . . . medical opinion, including from an individual's own healthcare providers."). As Nichols' application was filed before March 27, 2017, the treating physician rule applies. *See id*. § 404.1527.

14

documented as having positive straight leg tests, bilateral paralumbar tenderness, and needing a cane to walk. Nichols also received medical advice that he was not a good candidate for surgery because he likely would not get good results given his arthritis. Nichols further sought a second opinion as to whether surgery would be an option, but he was unable to afford the needed MRI or further follow-up treatment. While Nichols' treatment may have been "conservative" in the sense that he did not undergo surgery, that was only because surgery would not have helped or was otherwise unavailable. Thus, Nichols' credibility and the opinion of his treating physician (with respect to his ability to stoop and any other claimed limitations) cannot reasonably be discounted because Nichols failed to pursue invasive treatments that would not have likely improved his condition.[7] *See Thomas v. Colvin*, 534 F. App'x 546, 551–52 (7th Cir. 2013) (rejecting an ALJ's explanation that the claimant's "conservative treatment" was not what "one would expect" for someone with disabling pain, where the claimant had made "continuous efforts" to treat her back pain).

It should also be noted that the ALJ's reliance on Dr. Manders' testimony does not serve as a basis to affirm the ALJ's ultimate RFC finding. This is so, because despite the ALJ's deeming Dr. Manders' opinions as "well-supported by the evidence," the ALJ never bothered to

---

[7] Nor may the ALJ discount Nichols' testimony because he wasn't prescribed a cane (when in fact he actually was), *Terry*, 580 F.3d at 477–78, or because he later curtailed his back treatment (without also considering his financial reasons for doing so). *Craft*, 539 F.3d at 679; *see also Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

discuss the appropriateness of the sit-stand option[8] and ergonomic accommodations[9] which Dr. Manders opined were necessary in order for Nichols to sustain fulltime work. Thus, because the ALJ failed to provide *any* explanation for rejecting the ME's stated restrictions which could erode the occupational base of sedentary work, there is not substantial evidence to support a finding that the ALJ properly incorporated all of Nichols' limitations in his RFC opinion. *See, e.g., Borski v. Barnhart*, 33 F. App'x 220, 224-25 (7th Cir. 2002) (finding insufficient basis in the evidence and discussion for the ALJ's conclusion that the claimant was capable of fulfilling the frequent sitting and occasional standing and stooping requirements of sedentary work without a sit/stand option).

Here, the ALJ's insufficiently supported RFC findings led the ALJ to ask hypotheticals of the VE which omitted Nichols' claimed (and potentially credible) limitations caused by his chronic and well-documented back problems. For this reason (and given the VE's misunderstanding of the non-exertional requirements of sedentary work), the VE's testimony cannot be relied upon as an accurate indicator for the type of work that Nichols is capable of performing.[10] *See Young v. Barnhart*, 362 F.3d 995, 1003-05 (7th Cir. 2004) (the ALJ must

---

[8] Most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. SSR 83-12. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at-will. *Id*. Thus, in cases of unusual limitation of ability to sit or stand, a VE should be consulted to clarify the implications for the occupational base. *Id*.

[9] To support a fifth-step finding that an individual can perform 'other work,' the vocational expert testimony would have to show that the job, which is within the individual's capacity because of employer modifications, is representative of a significant number of such jobs in the national economy. *See Eaglebarger v. Astrue*, No. 111-CV-00038, 2012 WL 602022, at *5 (N.D. Ind. Feb. 23, 2012) (citations omitted).

[10] Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is

determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); SSR 96-8p. Thus, until the hypotheticals presented to the VE include the functional limits that the ALJ accepts as credible, and the ALJ adequately explains the claimant's actual limitations and resulting RFC based on the relevant medical evidence, 20 C.F.R. §§ 404.1545, 404.1546(c), step five cannot be affirmed in this appeal. *See Young,* 362 F.3d at 1003-05.

The remedy for the shortcomings noted herein is further consideration, not an award of benefits as requested by Nichols' counsel.

## V. CONCLUSION

For the reasons stated above, the Court REVERSES the Commissioner's decision and REMANDS this matter to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED: September 14, 2017

/s/ JON E. DEGUILIO
Judge
United States District Court

---

capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE never indicated having reviewed Nichols' medical records, nor did she indicate in her responses having relied on those records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, and not on the record itself or the limitations of the claimant himself. *Id*. (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).